IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

JASMINE JONES,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )    CIVIL ACTION NO. 16-0441-MU
                                  )
NANCY A. BERRYHILL,               )
Acting Commissioner of Social     )
Security,[1]                      )
                                  )
        Defendant.                )

## MEMORANDUM OPINION AND ORDER

Plaintiff Jasmine Jones brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her claim for Supplemental Security Income ("SSI"), based on disability. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 30 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed. R. Civ. P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, … order the entry of a final judgment, and conduct all post-judgment proceedings.")). *See also* Doc. 31. Upon consideration of the administrative record, Jones's brief, the Commissioner's brief, and all other documents of

_____

[1] Nancy A. Berryhill has replaced Carolyn W. Colvin as acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill has been substituted as the defendant in this action. *See* 42 U.S.C. § 405(g).

record, it is determined that the Commissioner's decision denying benefits should be affirmed.[2]

## I. PROCEDURAL HISTORY

Sylvia Jones, Jasmine Jones's custodial grandmother, filed an application for SSI on her behalf, based on disability, under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383d, on April 26, 2010, alleging disability beginning on May 31, 2006. (Tr. 273-76). She was awarded benefits on June 4, 2010. (Tr. 138-39, 1043-58). When Jones turned 18, her eligibility for SSI benefits was re-determined under the rules for disability in adults, and on February 16, 2012, it was determined that she was no longer disabled as of February 1, 2012. (Tr. 150). On March 14, 2012, Jones filed a request for reconsideration, which was denied on June 5, 2013. (Tr. 155,184-87). On June 13, 2013, she requested a hearing by an Administrative Law Judge (ALJ). (Tr. 190). After hearings were held on June 11, 2014, and October 22, 2014, the ALJ issued an unfavorable decision finding that Jones was not under a disability from the date the application was filed through the date of the decision, March 23, 2015. (Tr. 73-107, 59-72, 18-58). Jones appealed the ALJ's decision to the Appeals Council, which denied her request for review of the ALJ's decision on June 29, 2016. (Tr. 520-28, 1-8).

---

[2] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 30 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

After exhausting her administrative remedies, Jones sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed an answer and the social security transcript on November 22, 2016, and a supplemental transcript on January 18, 2017. (Docs. 10, 11, 17). On February 17, 2017, Jones filed a brief in support of her claim. (Doc. 22). The Commissioner filed her brief on May 16, 2017. (Doc. 29). The parties waived oral argument. (Docs. 34, 35). The case is now ripe for decision.

## II.  CLAIMS ON APPEAL

Jones alleges that the ALJ's decision to deny her benefits is in error for the following three reasons:

1.  The ALJ was impermissibly biased against Jones because he seemingly pre-judged his decision based on the fact that Jones has not worked, attempted to find work, or sought assistance from a vocational rehabilitation service;

2. The ALJ erred in his assessment of the weight to be afforded the opinion of Jones's treating neurologist, the opinion of her treating psychologist, and the opinion of the psychological consultative examiner; and

3.  The ALJ erred in finding that Jones did not have any severe impairments. (Doc. 22 at p. 2).

## III. BACKGROUND FACTS

Jones was born on August 25, 1993 and was 21 years old at the time the ALJ issued his opinion denying her benefits. (Tr. 352). Jones alleged disability due to mental issues, behavior problems, seizures, and breathing problems. (Tr. 335). She graduated with a standard diploma on May 23, 2011, and she passed

the Alabama High School Graduation Exam on her sixth attempt. (Tr. 453-54).

Records from Wilcox Central High School reflect that, at the end of her senior

year, she had earned 27 credits, had a weighted GPA of 1.917, a numeric

weighted cumulative average of 72.484, and was ranked 141 out of 154 in her

class. (Tr. 453). She has never worked. (Tr. 216, 233). Jones engages in limited

daily activities; such as, sleeping, watching television, eating, and occasional

light chores around the house. (Tr. 334, 336, 342, 346). She can dress and

generally care for herself, but she needs reminders to bathe and change clothes.

(335-336, 345-46). She is limited in preparing food and must be supervised

because of her seizures. (Tr. 336, 346). She can count change, but has never

paid bills, handled a savings account, or used a checkbook. (Tr. 337, 347). She

cannot drive. (*Id.*). After conducting two hearings, the ALJ made a determination

that Jones's disability ended on February 1, 2012, and she had not become

disabled again between that date and the date of his decision. (Tr. 21).

## IV. ALJ'S DECISION

The ALJ made the following relevant findings in his March 23, 2015

decision:

> **2. Since February 1, 2012, the claimant has had the following severe combination of impairments: obesity with noncompliance; seizure disorder with significant evidence of noncompliance and relatively well controlled with medication; allergic rhinitis, refractive error and keratoconjunctivitis in both eyes; anemia; history of stuttering; history of oppositional-defiant disorder, impulse control disorder; mild major depression; depression with bipolar mood swings; anti-social personality disorder; questionable intermittent explosive disorder; questionable mild receptive language delay secondary to possible malingering; questionable borderline intellectual**

**functioning; and questionable unspecified type schizophrenia, unspecified state 3. [sic] (20 CFR 416.920(c)).**

The undersigned carefully reviewed the medical and other evidence of record. As indicated above, the undersigned found that, individually, none of the claimant's impairments cause greater than slight limitation in her capacity for work activity. Therefore, individually, they are nonsevere. However, although the undersigned found that they may be severe in combination, this conclusion is based in part on Agency guidance and overwhelming but suspect medical evidence.

As Agency guidance directs, the undersigned's conclusion that the claimant's impairments are nonsevere, is not the final step in the analysis. The undersigned must also assess the cumulative effect of the claimant's nonsevere impairments. If the combination of the claimant's impairments causes greater than slight limitation in the claimant's capacity for work activity, then the undersigned must proceed with the sequential analysis and determine how said combination, limits the claimant's capacity for mental and/or physical work activities. If the undersigned concludes that said combination does not cause greater than slight limitation, then the undersigned may complete the decision at the related step in the sequential analysis. However, this conclusion must be unequivocal. If the undersigned cannot rule out the possibility that said combination causes greater than slight limitation in the claimant's capacity for work activity then the undersigned must complete the remaining steps in the sequential analysis (SSR 85-28).

Quite candidly, the undersigned does not believe that the claimant's impairments collectively cause limitation in her capacity for mental or physical work activity. Based on the claimant's credibility as it relates to her allegations, as well as the credibility of those around her, the record strongly suggests that the claimant is determined to obtain disability compensation, regardless of her ability to perform work activity. However, while the undersigned's opinion is significant, the record is littered with medical source opinions indicating limitation, and even some reports indicating disability.

While the undersigned disagrees with such opinions -- and wholly rejects any opinion that suggests that the claimant is disabled -- the totality of the evidence prevents the undersigned from unequivocally ruling out the possibility of limitation. Accordingly, the undersigned found that there was at least enough colorable evidence to report the limitations highlighted below. Nevertheless, any suggestion of greater limitation is grossly inconsistent with and not supported by the totality of the medical or objective evidence of record. As an aside, as

suggested above, subjective reports provided by the claimant, her mother and her grandmother, unfortunately warranted and received very little weight. As suggested above, there is clear evidence that pursuit of disability compensation was a collective goal.

This is the *claimant's fourth application.* Two administrative law judges denied applications in 2006 and 2008, respectively (Exhibits C1 and 2A). The first was not appealed. The Appeals Council denied her appeal of the second decision in June 2010 (Exhibit C6A). The claimant and her family would not be deterred. They, the claimant was a child, submitted a third application on April 2010, prior to receiving the Appeals Council decision. In fact, they submitted the application prior to an Individualized Education Program (IEP) report (Exhibits C4F). Not surprisingly, the IEP report does not support the previous applications or the application submitted a month before its completion.

As part of the IEP process, the claimant reported seizure activity without indication of any severe limitations secondary to seizure activity. Most glaring, the claimant reported **"no other reported medical problems"** (Exhibit C4F, page 3) (emphasis added). As the two previous decisions show, *the claimant's reports of medical problems for education purposes* is *grossly inconsistent with her report of medical problems for disability compensation.* This gross inconsistency is enough standing alone to detract wholly from the claimant's allegations. However, there is more evidence to share.

The author also noted that the claimant did not get along with her mother who was also receiving disability compensation (Id.). The claimant reported that she needed to improve in the area of getting along with others such as teachers and peers; however, there was no indication of any severe deficit in this area. The claimant's English teacher reported that the claimant **"stays on task and completes all of her assignments"** (Id.) (emphasis added). The teacher also felt that the claimant could do better to interact with others. However, her Math teacher reported that the claimant **gets along "very well"** with her peers (Id.) (emphasis added). Despite the suggestion that she improve her interactive skills, there was certainly no objective evidence to indicate that she did not or was markedly (or even moderately) unable to interact with others. *Neither teacher had anything negative to say about their interactions with the claimant.* Although the Math teacher had the most concern regarding her subject knowledge, *the claimant successfully completed her Math exit examination.* At the time of that portion of the IEP, she had failed all other exams. Digressing briefly, the undersigned rejects the notion that she passed that test first, yet suffered from mild mental retardation. Additional evidence below

confirms that conclusion.

The IEP also reported the claimant's 11th grade course grades. The claimant completed **Plant Biotechnology** with a B. She achieved a C in English II, and **BusTech Applications**. Unfortunately, she obtained a D in **Botany, Geometry**, and **Physical Science**. Lastly, and most disturbing, she achieved an F in US History II (Id. at 1). These scores are indicative of her functioning on many levels, none of which supports a conclusion that the claimant is disabled.

The undersigned notes that it [sic] highly unlikely that an individual functioning within the mentally retarded or borderline ranges of intellectual functioning would be placed in such classes; and although her grades were not overly impressive conversely, based on the subject matter and her reported limitations they were not overly unimpressive. Over the year, the claimant scored a 91, 88, 90, and 83 in Plant Biotechnology; yet, in US History II, she scored a 50, 76, 63, and 45 (Id.). While some possibly unknown factor was at play, intelligence and cognitive ability did not cause the discrepancy. The remaining grades and relevant subject matter do not provide support for any report of marked deficiency in either area.

The claimant did continue to receive special education assistance in a general education setting. However, her 12th grade classes did not offer any respite from classes that demanded more from her than expected of someone function in the aforementioned ranges. Per the IEP, she was to enroll in the following classes: English 12, **Physics, Pre-Calculus**, **Government/ Economics**, **Choir**, Family Wellness, and AHSGE Basics (Id. at 3) (emphasis added). The claimant's planned classes are grossly inconsistent with borderline intellectual functioning and certainly grossly inconsistent with mild mental retardation. The undersigned notes that not only does service in the *Choir* suggest greater mental functioning than suggested; it also shows that the claimant did not suffer any moderate or marked limitation in her capacity for interaction with others such as choir mates. The team also assessed the claimant's future in terms of her diploma and the type of work activity she might enjoy. The team reported the following, in relevant part:

**her strengths in reading and a desire to care for and help others, a preference for working with people** leading toward Jasmine's transitional goals for adult life, the IEP Team has selected the **Regular Diploma Option** for her... (Id. at 3) (emphasis added).

The evidence shows that the application for disability the claimant and

her family submitted to the State agency a month before the IEP was completed was based purely on pursuit of compensation and not on the presence of any disabling impairment. This conclusion is not only based on the IEP which includes the claimant's subjective reports, but also two judges concluded she was not disabled prior to the IEP and the Appeals Council agreed a few months after the IEP. The undersigned finds that any conflicting reports or opinion, including the State agency's conclusion that she was disabled at that time, are without merit and questionable at best. Each instance of a contrary position is tainted by the claimant's clear goal and the undersigned finds all allegations lacked merit.

The claimant's grandmother did report that, *during high school, the claimant was struck* in the head. However, her attempt to show that there was some intervening factor that caused her to depreciate in the cognitive functioning is also without merit. As noted above, the family began pursuing benefits as far back as 2004, long before the claimant started high school. Her later reports and the subsequent tests are not persuasive and warranted little weight.

Others involved in this process have questioned the claimant's motives as well. For example, despite her uneven reports of seizure activity, every time she visited an emergency room related to seizure activity, *laboratory testing indicated that the claimant was not taking her medication as directed.* More recently, in 2014, the claimant and her grandmother visited her neurologist. *The doctor was puzzled after neither could tell him when she experienced her last seizure or how often she was experiencing seizures.* Although, the undersigned allowed for limitations secondary to this condition, because of the breadth of the medical evidence, the undersigned strongly believes that the claimant is noncompliant with medications. The record relevant to the period before the undersigned is void of a single documented report of seizure activity provided by anyone outside of the claimant's family. Upon virtually every visit to her doctor or an emergency room, the claimant was fully functioning without signs of depreciation or residuals.

Although the bulk of the medical evidence is discussed below, a few brief comments from consultants are warranted here. The IEP discussed above, contains little to no mention of the claimant's reported stutter. The undersigned notes that her treatment records contain little mention of a stutter as well. Nonetheless, the State agency sent the claimant out for a consultative speech evaluation. The consultant reported the following, in relevant part:

[a]ccording to Jasmine, she is here today because she stutters.

Jasmine stated "I stutter 24-7." **However, during the course of the 90-minute evaluation this examiner did not observe a single stuttering event under any speaking situation** . . . (Exhibit C22F, page 2) (no emphasis added).

The undersigned must stress that the consultant and not the undersigned highlighted the information in bold above. She did not stop there. She added:

In general, language skills were judged to **NOT impair** communication skills during activities of daily living. . . Test results are felt to be lower than **Jasmine's true ability due to possible malingering**. . . (Id. at 4) (no emphasis added).

Once again, the consultant added the caps and bold letters. Ultimately, the consultant assessed: **mild receptive language delay and expressive language delay secondary to possible malingering** (Id.) (emphasis added).

The consultant's opinion warranted and received great weight. As noted, it is consistent with the lack of limitation reflected in the IEP. It is also consistent with multiple visits with doctors and other such professionals, which do not indicate any notable limitation in her capacity for speech. However, although the consultant somewhat tempered her opinion with the use of the word "possible" her use of highlights make clear that she felt the claimant was malingering.

In fact, the record contains treatment notes and multiple opinions from her mental healthcare provider, Richard Reynolds, Ph.D. He has been involved in her mental healthcare since approximately 2010. *His opinions* all suggest that the claimant is disabled. In one report, he opined, without relevant medical evidence, that the claimant's impairments meet the requirements of listings 12.03 and 12.04 (Exhibit C36F). On September 13, 2012, he reported that the claimant suffered marked-to-extreme limitation in her capacity to respond to customary work pressures. He reported she suffered marked limitation in her ability for the following as well: responding appropriately to supervision, coworkers, the public, and change in routine (Exhibit C28F). However, *recent treatment notes* are grossly inconsistent with his opinions. The notes reveal the following interaction, in relevant part, on May 8, 2014:

Pt. presents with weight gain. **Continued report of chronic boredom.** Pt. continues to say **I'm depressed because I have nothing to do**... Writer **urged daily exercise, both as life activity to address boredom and to address weight gain**. Discussed need **to seek activities out of home, such**

**as volunteering at the library** to address boredom... (Exhibit C34F, page 2) (emphasis added).

This report does not support the notion that the claimant suffers marked limitation in the areas report [sic] and certainly no extreme limitation. Apart from possibly janitorial work, most voluntary work at a library would require at least some semiskilled activity and certainly some ability to respond appropriately to others, including the public. In fact, the undersigned is puzzled as to how treatment personnel thought she could do volunteer work in a library, yet failed to recommend that she try to work with vocational rehabilitation and/or seek unskilled work activity. As suggested above, the record continues to indicate that the claimant and those around her are set on the disability compensation course and even her ability to engage in at least some work activity is apparently not an obstacle. It should also be noted that clearly, despite all of purported mental deficits, the claimant clearly suffered no mental limitation in her capacity to lose weight. Once unsupported opinions are taken out of the equation, the notes strongly support the undersigned's conclusions.

As noted above, the undersigned is convinced that the claimant does not suffer a severe impairment. The undersigned believes that even collectively, the claimant's impairments do not cause greater than slight limitation. Nonetheless, the undersigned cannot unequivocally conclude that said combination does not cause limitation. Accordingly, in an abundance of caution, the undersigned considered all evidence, including medical source opinions discussed below and found there is colorable although suspect evidence to find the limitations set out below.

However, the undersigned also emphatically notes that any suggestion of greater limitation is grossly inconsistent with the totality of the evidence as set out here and below.

**4.    Since February 1, 2012, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

The undersigned Administrative Law Judge has considered listings 11.02 for convulsive epilepsy, 11.03 for nonconvulsive epilepsy, 12.02 for organic mental disorders, 12.03 for schizophrenic, paranoid and other psychotic disorders, 12.04 for affective disorders, 12.05 for mental retardation, and 12.08 for personality disorders.

As to listings 11.02 and 11.03, the record shows the claimant to have

generalized seizure disorder. Description of seizures indicates they are both convulsive and nonconvulsive. Emergency room records seem to show they are mostly nonconvulsive with no shaking, jerking or loss of bowel or urine (Exhibit C17F). Whether convulsive or nonconvulsive, it is unclear from the treatment record her seizures' frequency. However, the undersigned notes that a treating neurologist Walid W. Freij, M.D., has completed a medical source statement, dated June 24, 2014 (Exhibit C37F). Therein, he indicated that the claimant has convulsive seizures more than once a month and nonconvulsive seizures about once a week and that she had good compliance with treatment. The undersigned gives little weight to this opinion. First, there is no evidence that Dr. Freij has witnessed seizure activity in his office. He has only seen the claimant for routine visits every six months. His opinion is based solely upon the reports of the claimant and her family members. Second, the doctor's progress notes do not contain specific information regarding the number of convulsive seizures and the number of nonconvulsive seizures during the six-month periods between doctor visits. In fact, in progress notes dated May 12, 2013 -- the month prior to completing his medical source statement-- Dr. Freij noted that, **based upon the responses of the claimant and her grandmother, he could not tell how many seizures she was experiencing** (Exhibit C38F) (emphasis added). Moreover, while the doctor reports compliance with treatment, the medical record shows the claimant to have a significant history of medication noncompliance; low levels of Dilantin (Phenytoin) in her system during the adjudicative period; and untimely refills of anti-seizure medications, as shown in pharmacy records, which suggest missed doses (Exhibits C30E, C43E, C3F, C17F, C18F, C25F). For these reasons, the undersigned finds that the claimant does not meet or medically equal the listings for epilepsy.

The undersigned has considered listing 12.05C for intellectual disability. This listing requires the claimant to have significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22, with *valid* verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Attorney Coplin suggested at the disability hearing that the claimant has an intellectual disability based upon a diagnosis of mild mental retardation. He also contends that she has *valid* IQ scores between 60-70 (Exhibit C31E). The undersigned disagrees. The record does not

contain *valid* IQ scores between 60 and 70. The claimant was administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) on March 15, 2011 (Exhibit C6F). She obtained a Verbal Comprehension composite score of 81, Perceptual Reasoning composite score of 73, Working Memory composite score of 71, Processing Speed composite score of 86, and a Full Scale IQ of 74. Her Full Scale IQ score falls in the borderline range of intellectual functioning. It is also consistent with her Full Scale (FS) IQ score in 2006 (Exhibit C20F, page 13). The undersigned does note that Richard Reynolds, Ph.D., at Behavioral Health of Selma diagnosed mild mental retardation in July 2012 and September 2013 (Exhibit C29F, page 2). However, his diagnosis is inconsistent with the above scores and with his previous diagnosis of Borderline Intellectual Functioning (Exhibits C29F, page 7). His diagnosis of MMR is also inconsistent with claimant's academic achievement (Exhibit 29E). High school records show that the claimant was in the general education classroom. She took typical high school subjects, such as Economics, English, Geometry, Botany, U.S. History, and Algebra. She received limited special education services in the 12th grade, which provided remediation in reading and math. This was to prepare her for taking the Alabama High School Graduation Exam (AHSGE). She passed the AHSGE in the spring of 2011. She graduated high school on May 23, 2011 with a standard diploma (Exhibit C29E, page 1).

Linda Duke, Ph.D., completed a form entitled, "Psychiatric Review Technique (PRT)," dated February 15, 2012 (Exhibit C14F). Therein, she evaluated the claimant under 12.02 for organic mental disorder (borderline intellectual functioning) and 12.08 for personality disorder. Under the "Paragraph B" criteria of the listings, she indicated that the claimant has mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation, each of extended duration. She further stated that the evidence does not establish the presence of the "C" criteria.

Donald E. Hinton, Ph.D., completed [sic] form entitled, "Psychiatric Review Technique (PRT)," dated April 30, 2012 (Exhibit C20F). Therein, he evaluated the claimant under 12.02 for organ[ic] mental disorder, 12.04 for affective disorder, and 12.08 for personality disorder. Under the "Paragraph B" criteria of the listings, he indicated that the claimant has mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration. He further stated that the evidence does not

establish the presence of the "C" criteria.

The undersigned Administrative Law Judge gives significant weight to Dr. Duke's and Dr. Hinton's PRT's. These mental health professionals generally agree that the claimant's mental impairments do not meet or medically equal listing severity. They reviewed the evidence of record and provided specific findings for their opinions.

As noted, Richard Reynolds, Ph.D., completed a medical source statement, dated June 18, 2014 (Exhibit C36F). Therein, he indicated that the claimant meets the qualifications for listings 12.03 and 12.04. Dr. Reynolds is a treating psychologist. However, the undersigned gives little weight to his opinion. First, Dr. Reynolds does not state with specificity how these listings are met under paragraphs A, B or C. Second, from review of his progress notes, Dr. Reynolds appears to have based his opinion primarily upon the subjective reports of the claimant and her family members on June 17, 2014 (Exhibit C40F, page 10). Third, Dr. Reynolds' opinion is inconsistent with mental health treatment during the adjudicative period. The claimant has required no psychiatric hospitalizations. She has attended outpatient family counseling on a monthly basis and taken low doses of psychotropic medications. Fourth, on October 7, 2014, Dr. Reynolds noted that the claimant was generally stable on medication with two or three "bad days" per week with anger outbursts and paranoid ideation and that the claimant has been compliant with medication (Exhibit C40F, page 2). Yet, other evidence shows noncompliance. According to Dr. Reynolds' records, the claimant should have been taking Lexapro (Escitalopram) and Zyprexa (Olanzapine) during the adjudicative period. Pharmacy records show untimely refills of these medications (Exhibits C30F, C43F). The undersigned notes that, while claimant's grandmother controls her SSI payments (See Testimony), it does not appear that she made sure that claimant gets her medication regularly. This puts into question whether claimant's family members truly see her as mentally disabled. Fifth, Dr. Reynolds' opinion is inconsistent with those of Drs. Duke and Hinton.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.03, 12.04, and 12.08. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A

marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. The claimant is mentally able to initiate, sustain, and complete activities such as attending to her personal care, preparing meals, shopping, and managing finances, independent of direction or supervision. While the claimant's impairments may interfere with complex activities, the claimant's performance of a simple routine is appropriate, effective and sustainable.

In social functioning, the claimant has moderate difficulties. The claimant can communicate clearly, demonstrate cooperative behaviors, initiate and sustain social contacts and participate in group activities. However, the claimant reported that she has difficulty interacting with others, including authority figures. Medical evaluations, discussed below and above, contain indication of at least some difficulty consistent with the claimant's reports. Nonetheless, the evidence does not suggest greater than moderate limitation in this domain.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant can sustain the focused attention and concentration necessary to permit the timely and appropriate completion of tasks commonly found in routine and repetitive, not detailed or complex, work settings.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. There is no evidence of psychiatric hospitalization or serious loss of adaptive functioning during the adjudicative period.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria ("paragraph D" criteria of listing 12.05) are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria of 12.02, 12.03, 12.04, and 12.08 are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. There is no evidence of repeated episodes of decompensation, each of extended duration; no residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate; and no current history of one or more years'

inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. The claimant prepares simple meals, cleans her room, does some laundry, shops in stores once or twice a month for two or three hours, watches television, plays card games and checkers, and attends church. While she reports not being able to go outside alone or drive, she attributes this restriction to seizures, not a mental impairment (Exhibit C13F).

* * *

**5. After careful consideration of the entire record, the undersigned finds that since February 1, 2012, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can sit at least three hours without interruption and a total of at least six hours over the course of an eight-hour workday. The claimant can stand and/or walk at least two hours without interruption and a total of at least six hours over the course of an eight-hour workday. The claimant is not limited in the use of her extremities. The claimant cannot climb ladders, ropes, poles, or scaffolds. The claimant can occasionally climb ramps and stairs. The claimant can frequently balance. The claimant can occasionally stoop, kneel, and crouch. The claimant cannot crawl. The claimant can frequently work in wetness and extreme cold. The claimant can occasionally work in humidity and extreme heat. The claimant can occasionally work in dusts, gases, odors, and fumes. The claimant cannot work in poorly ventilated areas. The claimant cannot work at unprotected heights. The claimant cannot work with operating hazardous machinery. The claimant cannot work in hazardous environments such as a construction zone. The claimant cannot operate motorized vehicles. The claimant can perform simple, routine, and repetitive work activity with the following limitations: The claimant cannot perform work activity that requires her response to rapid and/or frequent multiple demands. The claimant can respond appropriately to supervision; however, she can perform and is better suited for work activity that requires only occasional supervision. The claimant can frequently interact with coworkers as long as interaction is casual. The claimant cannot perform work activity that requires her interaction with the public.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted

as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

* * *

The claimant testified that she is 20-years old. Her height is 5 feet, 7 inches. Her weight is 350 plus pounds. She completed high school. She attended Wilcox Central High School where she made D's and F's. She received special education in all subjects. She did not receive a piece of paper, such as a diploma or certificate, when she finished school. She has never tried to work or look for a job.

The claimant testified that she is unable to work because of seizures, bad eyesight, weight problems, and difficulty getting along with other people. She takes anti-seizure medication, which works, but she still has two or three seizures per month. Her last seizure occurred last month. After a seizure, she feels tired and has to lie down. She sees Dr. Freij every six months for seizures. Her next appointment is in November. He has put her on new medication for seizure control. The new medication helps a little.

The claimant testified that she sees Dr. Wyatt, an eye doctor. In 2010, she fell and broke her glasses during a seizure. She has also broken a contact. She cannot see out of her eyeglasses and wears contacts. She cannot see at all without her contacts. With contacts, she can see. She puts them in her eyes herself, takes them out every night, and puts them in solution or in a case. Her eye doctor told her that as she gets older, her eyesight will worsen. Her bad eyesight did not prevent her from finishing high school.

The claimant testified that she sees her psychologist Dr. Reynolds every month. He prescribes her medication. She has knocked down her grandmother and has talked about jumping of the roof. She does not like her mother and has tried to poison her and to kill her with an ax hammer. The claimant has tried to hurt herself and has scars on her arms where she tried to burn herself. She did not know how many times she had attempted to injure herself. She also hears voices every day. It is a female voice. The voice tells her to kill herself because she does not belong here. She sometimes has trouble sleeping at night. Her medication helps with sleep.

The claimant testified that her medications make her drowsy. She spends all day lying down.

The claimant testified that she uses an inhaler four times a day, twice in the morning and twice at night.

The claimant testified that she could not perform a job that required her to sit down all day long and count gadgets. More specifically, she stated that she could not sit still. When asked why she could not sit still, she responded that, in school, she would get up and leave class. She admitted, however, that she did complete high school with some help. She then stated that *her counselor at school had changed her grades.* Her parents were not aware of these changes.

The claimant testified that she lives with her mother and grandmother. She does not do any household chores. Her grandmother does the chores. The claimant does not have a driver's license and has never driven. She did not take driver's education in school. She has never had a checking account or written a check. She does not have a computer at home. There is no computer in the house. Her auntie made her a Face Book page. Her screen name is Jasmine Jones. *She does not know if she has any friends on her Face Book page.* When questioned about this further, she admitted her auntie was on her Face Book page. She does not have a Twitter or Yahoo account. She has never had a cellphone. She has no instant messenger with any online service. She has never instant messaged anyone in her life. *She played computer games, i.e., Solitaire, in school.* A friend at school taught her how to play Solitaire and how to skip class. They skipped class and walked around the hallways in school. She does not go to the mall. There is no mall in Wilcox County. However, she has been to a mall where she walked and looked at clothes. She did not buy anything because she had no money. The last time she went to a mall was last year. Her grandmother has possession of her money and gives her about sixty dollars per month. However, by the time she goes to the mall, she has no money. She spends her money on junk like soda, candy and chips.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The medical record shows that the claimant is obese. She has a height of 5 feet, 7 1/2 inches. During the adjudicative period, her weight has ranged from 323 - 379 pounds. These vital signs produce body mass indices between 50 and 58. The undersigned has considered the impact of the claimant's obesity in exacerbating her problems and

functional limitations caused by her other impairments. The undersigned must consider obesity alone, as well as with other impairment in assessing limitation of functioning. The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone (Social Security Ruling 02-1p). In this case the undersigned carefully considered all of the evidence and found that standing alone, the claimant's obesity is not disabling. Additionally, the undersigned carefully considered the claimant's obesity along with all impairments. Although said combination does cause the limitations highlighted above, said combination did not cause any listing level limitation or cause the claimant to be unable to perform all work activity.

The undersigned does note that claimant has reported having breathing problems and using an inhaler four times a day (Exhibit C 12E, page 2; Testimony). However, the treatment record does not contain any regular medical care for respiratory symptoms during the adjudicative period, until January 2014. That month the claimant complained of cold symptoms but did not have a history of allergies or asthma. Her family doctor Roseanne Cook, M.D., found her to have clear nasal discharge, postnasal drainage, and wheezing on examination. She diagnosed allergic rhinitis and prescribed medications, including an inhaler (Exhibit C32F, pages 7-9). Dr. Cook's subsequent records reflect that the claimant continued to have occasional postnasal drainage, but normal auscultation of the lungs and normal respiratory effort (Exhibit C39F). Pharmacy records show that Proair inhalers were dispensed between January 2014 and August 2014 (Exhibits C30E, C43E).

The undersigned notes here, that the claimant has not complied with her doctors' advice to lose weight. Instead of losing weight, she has in fact gained weight, from 323 pounds on February 2012 to 379 pounds in September 2014 (Exhibits C18F, C27F, C32F, C39F). Her doctors have repeatedly advised her to follow a low salt/low fat diet; to exercise by walking and doing household chores and yard work; to watch her calorie intake; and to eat more vegetables (Exhibit C10F, pages 20, 21, 22; C26F, page 4; C27F, pages 7, 16, 19, 21-23; C32, page 16). It appears that the claimant has not had the slightest interest in losing weight. On August 22, 2012, she reported eating large amounts of food and many sweets and not exercising (Exhibit C27F, page 22). On February 13, 2013, she reported not exercising (Exhibit C27F, page 7). At the disability hearing, she testified to spending her money on junk food.

The undersigned finds that, due to a combination of obesity and allergic rhinitis, the claimant might experience some shortness of breath and fatigue. He has considered this in the residual functional capacity by, among other things, limiting her to light exertional work; restricting postural movements; and providing environmental restrictions against pulmonary irritants.

As to seizures, the record shows a history of seizures since August 2004 (Exhibit C1F). On August 11, 2004, Walid W. Freij, M.D., at Neurology Consultants of Central Alabama saw the claimant for alleged staring spells. There was no evidence at that time of jerking, tonic-clonic movements or falling. There was no evidence of urinary or stool incontinence. An electro- encephalogram (EEG) demonstrated paroxysmal generalized spike and wave discharges suggestive of a generalized seizure disorder. On August 25, 2004, Dr. Freij started the claimant on Dilantin. He began seeing her on a routine basis every six months. For the most part, his records note that her seizures were well controlled in years 2004-2009. In 2010, the claimant had several seizures while taking Abilify. This medication was stopped, and her seizures decreased.

However, beginning in November 2011, the claimant reported an increase in seizure activity with visits to the emergency room. On November 21, 2011, at the ER, her grandmother reported that she had had two seizures that morning (Exhibit C17F). *They were not tonic-clonic type seizures.* She was currently taking 500 mg. of Dilantin a day. Her last seizure was ten days ago. According to ambulance personnel, the claimant was ambulatory at the scene. Upon arrival at the ER, she was alert and oriented times three. During the examination, the ER doctor observed her to be alert and oriented times 3 (a+ox3) with no neurologic deficits. The amount of Dilantin (Phenytoin) in her blood was 5 (Reference Range: 10-20 ug/mL) (Exhibit C17F, page 16). The ER doctor increased her Dilantin to 600 mg. a day and instructed her to follow-up with Dr. Freij. The claimant returned to the ER that same day with complaint of seizure (Exhibit C17F). *Her grandmother reported that she had been twitching her mouth and had some slurred speech. She had no active body movements or jerking. She was able to talk and answer questions.* Her phenytoin level was low at 6. The ER doctor provided intravenous Dilantin.

On January 12, 2012, claimant's Dilantin level was low at 3.3 (Exhibit 18F, page 15).

On January 21, 2012, the claimant visited the emergency room where she complained of having a generalized seizure (Exhibit C17F). Her

last seizure was in November. The claimant walked into the ER without difficulty. During the examination, the claimant reported feeling fine. She stated that she had not missed any doses of her medicines. The ER doctor observed her to have stable vital signs and no fever (VSSAF) and to be neurologically intact. Laboratory testing showed a low Dilantin level of 3 (Exhibit C17F, page 9). The doctor provided oral (po) Dilantin and discharged the claimant home. However, shortly after discharge, the claimant returned to the ER. She had had another reported seizure at home. She was postictal on arrival to the ER. The ER doctor noted that her Dilantin level had been *sub therapeutic* earlier. He observed that she was postictal but waking up. He provided Dilantin intravenously.

Three days later, on January 24, 2012, claimant's Dilantin level was normal at 15.5 (Exhibit C18F, page 13).

On February 17, 2012, claimant's Dilantin level was low at 9 (Exhibit C18F, page 11).

On March 10, 2012, the claimant visited the emergency room where she was reported to have a seizure a few minutes ago (Exhibit C17F). She had been standing and talking on the porch, felt weak, and sat down. *She had no shaking. The medical staff observed her to be alert and oriented times three and to walk into the ER. She had no obvious injuries from the seizure. Urine and bowel incontinence was denied (Ø).* Her last seizure was in December 2011 ("last seiz=DEC 2011"). She stated, "I'm taking my meds." On examination, the ER doctor observed her to have 5/5 strength and no (Ø) deficits. He ordered laboratory tests. Her Dilantin level was low at 4. Her Depakote (Valproic Acid) level was low at 1.0 ug/mL (therapeutic range: 50.0-100.0 mg/ml) (Exhibit C17F, page 3).

The undersigned notes here, that these emergency room visits began after the Social Security Administration started its 18-age redetermination review. By June 2011, if not before, the Administration had already provided forms (i.e., Disability Report-Adult, Function Reports) to the claimant for completion in connection with its review (Exhibits C9E, C10E-C13E).

The above ER visits also coincide with low doses of Dilantin during that time. This suggests that the claimant was not taking anti-seizure medications as prescribed, which likely triggered her purported seizures. This behavior may have been intentional considering that her SSI payments were in immediate jeopardy of being cutoff. However, prior medical records tend to show a history of noncompliance. In years

2007-2009, the claimant was found to have low Dilantin levels in her blood (Exhibit C3F). In 2007, the [sic] Dr. Blackmon's office spoke to her grandmother about this. The grandmother reported that the claimant might have missed a few doses of Dilantin (Exhibit C3F, page 66). In 2008, Dr. Blackmon noted that the claimant was not taking her medicine properly (Exhibit C3F, page 63). In 2008, the claimant admitted him that she did not take her medications every night. The doctor counted (the capsules of) medication and noted that numerous doses had been missed (Exhibit C3F, page 36). In 2009, the claimant reported that she had not been taking four capsules of Dilantin at night. She sometimes took three, sometimes four, or just whatever she decided to take (Exhibit C3F, page 14). The undersigned notes that, during those years, the claimant had a disability application pending at the hearing level and the Appeals Council (Exhibits C2A, C6A).

Pharmacy records reflect missed doses of anti-seizure medication during the adjudicative period (Exhibits C30E, C43E). To give some examples, they contain refills of anti-seizures medications, including Phenytoin (Dilantin), Carbamazepine (Tegretal), and Vimpat. Each refill provided a thirty-day supply of medication. The pharmacy dispensed Vimpat on April 27, 2012 and June 1, 2012. This medication was not refilled again until July 23, 2012. The next refills occurred on September 15, 2012, November 9, 2012, December 24, 2012, January 21, 2013 and April 8, 2013 (Exhibit C30E, page 7). Phenytoin was filled on March 18, 2014 and April 21, 2014. It was not refilled until May 31, 2014 (Exhibits C30E, page 9; C43E, page 1). Carbamazepine was filled on April 1, 2014 and May 1, 2014. It was not refilled until July 24, 2014 (Exhibit C43E, page 1).

The claimant testified that she has two or three seizures per month and must lie down after a seizure. The undersigned finds her testimony questionable. During the adjudicative period, she has had no hospitalizations for uncontrolled seizures. She has had no emergency room visits for complaints of seizure since March 2012. As previously discussed, her Dilantin levels at the emergency room were low, suggesting noncompliance with medications. However, despite alleged seizures, the claimant did not see her treating neurologist Dr. Freij except for routine visits every six months (Exhibits C19F, C26F, C35F, C38F). This suggests that claimant, her mother, and grandmother had no serious concerns regarding her seizure disorder. During Dr. Freij's physical examinations, he observed the claimant to have normal motor power, coordination and gait. Also, claimant's and her family's reports of seizures have varied and were vague as to frequency. According to Dr. Freij's records, on October 17, 2011, she had 3-4 seizures in the

last six months. On April 16, 2012, she had one seizure on Wednesday. On October 15, 2012, she had a few seizures in the past six months. On April 15, 2013, she had a couple of seizures over the past six months. On October 14, 2013, she had two or three seizures a month. On May 12, 2014, the claimant reported having seizures, but her grandmother could not tell Dr. Freij their frequency or when the last one had occurred. Furthermore, from review of ER records and those of Dr. Freij, it appears that many seizures are nonconvulsive in nature. That is, they do not involve shaking, stiffness, biting of the tongue, or loss of bowel or urinary incontinence. Their duration is very brief, lasting 3-4 minutes, with no significant postictal symptoms (Exhibits C15E, C17F, C19F, pages 19-20; C26F, page 4). During most ER visits, the claimant was alert, oriented, verbal, and ambulatory upon her arrival. Neither the staff nor the examining doctor noted blood in her mouth, lacerations to the tongue, or loss of bowel or urinary incontinence.

The undersigned has considered claimant's seizures in forming the residual functional capacity by, among other things, restricting her against work in hazardous environments, operation of motorized vehicles, and unprotected heights.

As to vision, Brendan Wyatt, M.D., at Eye M.D., Associates saw the claimant in years 2010-2014 (Exhibits C7F, C41F). He diagnosed a refractive error and keratoconjunctivitis (KC), also known as dry eye. On February 21, 2012, January 18, 2013, February 5, 2014, her visual fields (vf) were full and her visual acuity with lenses was 20/30 in each eye (Exhibit C7F, page 4; C30F, pages 4, 7). On August 15, 2014, the claimant reported to Dr. Wyatt that she was not seeing as well with her contacts. Her visual acuity that day was 20/50 in the right eye (OD) and 20/25 in the left eye (OS) with correction (Vee). The doctor noted atypical scarring. He prescribed Acular PF drops for one month and order new glasses (specs). On September 15, 2014, the claimant reported that her eyes felt a little better and that her vision was some better with new glasses. Her visual acuity was 20/40 in each eye with correction (Exhibit C41F, page 4). The doctor recommended that she wear glasses for now. On October 13, 2014, the doctor found KC progression with decreased vision in claimant's right eye (20/400). He ordered a new right lens. The undersigned Administrative Law Judge notes that this last eye doctor visit, in which claimant's visual acuity had significantly decreased, took place nine days immediately before the disability hearing on October 22, 2014. Due to the timing of these events, the undersigned finds this sudden decrease in vision suspect. Interestingly enough, at the disability hearing, the claimant admitted that she could see with her contacts. While the undersigned finds her eye conditions do not require significant work limitations, the residual

functional capacity does provide restrictions that would accommodate some decrease in vision, such as no work at unprotected heights or operating hazardous machinery.

As to anemia, claimant's primary care physician Roseanne Cook, M.D., diagnosed this condition in September 2014. It is unclear the basis for her diagnosis. It may be based upon laboratory testing, but her records contain no test results. Her records are also absent any persistent symptoms reasonably related to anemia, such as fatigue, weakness or shortness of breath, and absent prescriptions for iron supplements (Exhibit C39F). There is no evidence to suggest the claimant has required blood transfusions during the adjudicative period. At the disability hearing, the claimant made no mention of anemia in her testimony. Nonetheless, the undersigned … has considered this condition in forming the residual functional capacity by restricting the claimant to light exertional work.

As to speech impairment, the claimant and her grandmother Sylvia Jones have reported that the claimant stutters and cannot be understood (Exhibits C21E, page 6; C25E, page 14). Based on their reports, the Social Security Administration referred her for a consultative evaluation. On June 4, 2012, Kathy W. Welch, M.A., CCC/SLP, performed a speech-language evaluation (Exhibit C22F). The claimant reported to Ms. Welch that she stuttered "24/7." However, during the course of the 90-minute evaluation, Ms. Welch did not observe a single stuttering event under any speaking situation. She observed no disfluency, even when the claimant was under pressure to answer questions. Ms. Welch did note that the claimant tended to mumble in connected speech; however, she had the ability to articulate appropriately but chose not to. Ms. Welch concluded that the claimant had age appropriate articulation skills.

Ms. Welch also administered the Oral and Written Language Scales (OWLS). The claimant obtained a receptive language standard score of 77 (mildly delayed) and an expressive language standard score of 73 (moderately delayed). Ms. Welch noted that the claimant had no difficulty following directions for testing or understanding and answering questions about daily living. There were several times during testing that she appeared to be malingering. On two occasions, she pointed to all three wrong answers but not the correct answer. Ms. Welch's informal observations suggested that claimant's expressive language skills were functional for activities of daily living. Informally, the claimant was able to tell about her daily routine, tell about her family and their animals, tell about the completion of school, and ask questions. She used appropriate syntax and grammar except for the occasional use of an

African-American variation.

Ms. Welch diagnosed: Mild receptive language delay and expressive language delay secondary possible malingering. In her opinion: Claimant's language skills were judged not to impair communication skills. Her functional communication skills were within normal limits based on formal testing and informal observations. Her speech intelligibility was judged to be approximately 80% during conversation. Her decreased intelligibility was due to her tendency to mumble rather than pronounce her words clearly. She was able to speak with 90% intelligibility if she gave adequate effort. Test results were felt to be lower than claimant's true ability due to possible malingering.

Rebecca C. Root, CCC-SLP, a speech pathologist, reviewed the record and concluded that claimant's communication impairment was "not severe" (Exhibit C23F).

The undersigned notes here that, in her disability reports, the claimant made no mention of stuttering as a condition that limits her ability to work (Exhibits C12E, page 2; C19E, page 1). At the disability hearing, she made no mention of stuttering when asked the reasons why she could not work. Other than some mumbling, the undersigned had no difficulty understanding her responses to questions. The undersigned finds the claimant does not have any significant communicative limitations that would require restrictions in the workplace.

Elizabeth H. Minto, M.D., completed a form entitled "Physical Residual Functional Capacity Assessment," dated February 16, 2012 (Exhibit C16F). Therein, she indicated that the claimant can perform less than a full range of heavy exertional work. The claimant has no exertional limitations. She can frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. She can never climb ladders, ropes or scaffolds. She should avoid all exposure to hazards, such as large bodies of water, commercial driving, speedboats and unprotected heights.

Gregory K. Parker, M.D., completed a form entitled "Physical Residual Functional Capacity Assessment," dated July 9, 2012 (Exhibit C24F). Therein, he indicated that the claimant can perform less than a full range of heavy exertional work. He noted that the claimant has no exertional limitations. She can frequently balance, stoop, kneel, crouch and crawl. She can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds. She has no visual limitations. She should avoid all exposure to workplace hazards, unprotected heights, free standing water, and commercial driving.

As to mental impairments, the record shows that the claimant was hospitalized on one occasion in April 2010. On April 23, 2010, Richard S. Reynolds, Ph.D., at Behavioral Health of Selma (BHS) saw the claimant for an initial psychological evaluation (Exhibit C11F). Dr. Reynolds noted that he had seen her initially seen [sic] in 2006, when she was diagnosed with attention deficit hyperactivity disorder, but no ADHD medications were ever started. On April 3, 2010, she was admitted to Hill Crest Hospital for two weeks for threatening her mother with an ax. Her current medications included Abilify and Lexapro. She acknowledged having stabbed a peer with a knife at school last year and having stabbed a different peer in the head with a pen last year. She reported having been in frequent fights. She reported that other children at school did not tell on her because they were afraid of her. She appeared to have no sense of remorse. She laughed and smiled when discussing these events. (The undersigned Administrative Law Judge notes here, that school records do not support claimant's reports. School records do not contain any disciplinary actions for aggressive behavior. Absences from school appear to have been unexcused (U) and not because of suspensions. In an Individualized Education Program (IEP) form, dated May 10, 2010, claimant's English teacher remarked that she got along very well with peers (Exhibits C8E, C29E)). Dr. Reynolds diagnosed Stuttering, Oppositional Defiant Disorder, Impulse Control Disorder, NOS, and Mild Major Depression and assessed a current GAF of 45-50. These scores, according to the *Diagnostic and Statistical Manual of Mental Disorders,* represent serious symptoms or serious impairment in social, school or occupational functioning. On June 4, 2010, the Social Security Administration found the claimant disabled as of April 6, 2010 due to mental impairments (Exhibit C3A).

Since April 2010, the claimant has not required any further psychiatric hospitalization. She has received treatment at Behavioral Health of Selma (BHS) on an outpatient basis.

On March 15, 2011, at BHS, the claimant was administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) on March 15, 2011 [sic] (Exhibit C6F). She obtained a Verbal Comprehension composite score of 81, Perceptual Reasoning composite score of 73, Working Memory composite score of 71, Processing Speech composite score of 86, and a Full Scale IQ of 74. Her Full Scale IQ score falls in the borderline range of intellectual functioning. The undersigned Administrative Law Judge questions the validity of these scores. They appear low given claimant's placement in the general education classroom and her receipt of a high school diploma. Though the claimant received special education services in the 12th

grade within the general education classroom, this was primarily to help her prepare for the Alabama High School Graduation Exam (AHSGE). Nonetheless, the undersigned has taken her scores into account when forming the residual functional capacity by restricting the claimant to simple tasks.

The Social Security Administration ceased claimant's disability in February 2012 (Exhibit C7A). Six months later, Dr. Reynolds prepared a psychological update report, dated July 26, 2012, in which he noted that the claimant had had a significant increase in psychiatric symptoms over the last six months (Exhibit C19F). She had become quite paranoid, guarded and mildly irrational. She had expressed thoughts of harming others. The undersigned Administrative Law Judge notes here, that her sudden increase in symptoms coincide[s] with the Social Security Administration's determination to cease her disability in February 2012. As such, the timing of these events is highly suspect. During the mental status exam, the psychologist's observations were largely unremarkable. He observed the claimant to be alert and oriented to person, place, time and situation. Her speech was normal for rate and flow, although she sometimes stuttered. She had logical thought content, tight thought associations, affect within normal limits for range and intensity, and intact recent and remote memory. Her mood was "okay." There was no history of suicidal or homicidal ideation, impulse or plan. Her judgment, insight and decision making abilities appeared impaired by history.

Dr. Reynolds diagnosed Schizoaffective Disorder, Stuttering, Oppositional Defiant Disorder, and Mild Range of Mental Retardation. He assessed a current GAF score of 55. This score, according to the *Diagnostic and Statistical Manual of Mental Disorders,* represents moderate symptoms or moderate impairment in social and occupational functioning. He ordered testing.

The Wide Range Achievement Test-Third Edition (WRAT-III) was administered on July 30, 2012. The claimant scored at "Early Elementary" level for Reading, Spelling and Arithmetic (Exhibit C29F). These scores were consistent with functional illiteracy. However, Dr. Reynolds noted that, **on previous IQ testing, she had scored in the Borderline Range with composite scores ranging from the Borderline to Low Average Range**. He concluded that her **achievement scores were significantly lower than previous IQ scores would predict and that determination of the validity of her achievement scores would require substantiation through previous school testing or other sources** (Id. at 6) (emphasis added [by ALJ]).

Claimant's presentation and achievement scores, in July 2012, strongly suggest malingering behavior. Two months before Dr. Reynolds' evaluation, on June 4, 2012, the Social Security Administration had sent her for a speech and language evaluation for reports of stuttering (Exhibit C22F). The consultative examiner did not observe any stuttering. School records show that, in the 2010-2011 academic year, the claimant took Algebraic Concepts and earned a 73 and 81 in this subject. This is inconsistent with her achievement score in Arithmetic. While claimant made D's (60) in English 12, she earned mostly 70's in her remaining courses. This is also inconsistent with functional illiteracy. The claimant passed all necessary portions of the Alabama High School Graduation Exam (AHSGE), including Reading, Language and Math, and received a standard diploma in May 2011 (Exhibit C29E).

On August 23, 2012, Dr. Reynolds amended his diagnoses to Schizoaffective Disorder and Borderline Range of Intellectual Functioning by previous testing.

BHS records reflect that, in years 2010-2014, the claimant received treatment in the form of monthly family therapy and medications (Exhibits C11F, C13F, C29F, C31F). In January 2012, she was taking Lexapro (Escitalopram), 5 mg each morning and Zyprexa (Olanzapine), 5 mg. at hours of sleep (qhs). In October 2012, Escitalopram was increased to 10 mg. daily. These doses remained unchanged for the next twenty-two months. In July 2014, Olanzapine was increased to 10 mg. daily. These are relatively low doses (Exhibits C30E, C43E). With treatment, her mental status remained stable. Progress notes, dated December 5, 2011, December 13, 2012, January 4, 2012, January 12, 2012, February 11, 2013, March 8, 2012, May 8, 2013 and July 8, 2013 reflect that the claimant was doing well; that she had significant (sig) improvement in anger management and no significant outbursts; that she had decreased (↓) anger, agitation and/or paranoia and increase (↑) in mood or self-control; that there was decreased (↓) conflict in the home; and that she was "stable" on treatment (tx).

Records of PineApple Health Center also indicate that claimant's mental status was stable in years 2012-2014 (Exhibits C27F, C39F). On June 20, 2012, her primary doctor observed that she was cheerful and cooperative and offered no complaints. On June 17, 2013, the doctor noted that claimant's schizophrenia and depression had improved. That day the claimant reported that Zyprexa and Lexapro worked well for her. During the physical examination, the doctor observed the claimant to be oriented to time, place, person and situation and to have intact memory, normal insight, normal judgment, and appropriate mood

and affect.

On August 7, 2013, Dr. Reynolds performed a psychological update. During the mental status exam, Dr. Reynolds noted that claimant's insight and judgment were shallow and poor. Otherwise, she was alert, cooperative and oriented to all spheres. Her speech was within normal limits for rate and flow. Her speech was articulate although she demonstrated stuttering at times. She had logical thought content, tight thought associations, "okay" mood, euthymic affect, and intact memory. She denied psychosis and denied suicidal/homicidal thoughts, impulse or plan. Dr. Reynolds assessed a current GAF of 55 and highest GAF in past year of 55. This score, according to the *Diagnostic and Statistical Manual of Mental Disorders,* represents moderate symptoms or moderate impairment in social and occupational functioning.

However, starting in September 2013, claimant and her family members began reporting symptoms of depression, paranoia, hallucinations, impulsive behaviors, and more anger outbursts (Exhibits C29F, C31F, C34F, C40F). *These reports began after the claimant had filed a request for hearing by an administrative law judge on July 14, 2013* (Exhibit C13B). The timing of these reports are highly suspect in light of successful treatment noted above. The first of such reports was made on September 9, 2013. That day Dr. Reynolds noted one episode of claimant having stabbed the table with [a] knife. However, he pointed out that she was "off meds" at the time and was "stable when on meds" (Exhibit C29F, page 12). During mental status exams (MSE), Dr. Reynolds noted that the claimant smiled inappropriately and had loose associations, a psychotic or borderline psychotic process, and/or illogical thinking. However, it is unclear whether these were his own observations or just reiteration of family members' reports. During MSE's, he also noted the claimant to be calm, fully communicative and relaxed and to have normal, coherent and spontaneous speech, intact language skills, intact memory, normal mood with no signs of depression or mood elevation, concrete reasoning, orientation to the current date, name, location and situation, and vocabulary/fund of knowledge in the borderline range. She denied suicidal and homicidal thoughts. Despite reports of increased symptoms, Dr. Reynolds did not recommendation [sic] hospitalization or increase frequency of therapy visits. The claimant continued to see him on a monthly basis for 20-30 minutes. On March 4, 2014, he recommended an increase in Lexapro, from 5 mg. to 10 mg. daily, due to claimant's depressed mood. In July 2014, Zyprexa was increased from 5 mg. to 10 mg. daily (Exhibits C30E, C43E). Even with these increases, her medications remained at relatively low doses.

On October 7, 2014, Dr. Reynolds stated that the claimant was "generally stable on medication" (Exhibit C40 F, page 2). Dr. Reynolds' statement is supported by psychiatric findings during visits at PineApple Health Center. Findings showed the claimant to be orientation [sic] to time, place, person and situation and to have a normal memory, and appropriate mood and affect (Exhibit C27F, C32F, C39F).

In addition to treatment records, there is one consultative psychological evaluation. On January 31, 2012, Nina E. Tocci, Ph.D., examined the claimant (Exhibit C12F). When asked her reason for applying for disability, claimant's maternal grandmother responded that she had "seizures."

During the mental status exam, Dr. Tocci observed the claimant to be casually dressed and fairly groomed. Her posture and gait were normal; her motor activity, unremarkable. She had good eye contact, responsive facial expressions, and a cooperative attitude toward the psychologist. She was oriented to time, place, person and situation. She spoke without impediment. Her affect was appropriate, normal and stable. She described her mood as "okay." As to concentration and attention, she incorrectly calculated change ($5.00-2.10=$4.00) and three of three arithmetic problems. She could not name five famous people ("me, my grandmother, my aunt, my mom"), five foods ("grass, wheat, broccoli, orange") or spell *world* and *earth* forward ("werid," "earh") or backward. In terms of memory, she incorrectly stated the current President ("Bush"), the immediate past President of the United States ("George Clinton"), and the Governor of Alabama ("I don't know"). She could repeat three digits forward and two digits in reverse. She was able to repeat three words and one of them after five- and thirty-minute intervals. She had poor fund of information. She incorrectly stated the number of months ("7") and days ("13") in a year, the direction of the sunrise ("in the sky"), and the number of items in a dozen ("10"). She knew the number of quarters and dimes in a dollar and the animal from wool comes. Her ability to abstract was impaired. For example, an orange/banana "they were the same color;" dog/lion had "sharp teeth," and table/chair "you could sit on it." She could not provide interpretations to three simple proverbs. The claimant reported experiencing auditory hallucinations and some delusions about roaches getting into her car. However, she demonstrated thought content appropriate to mood and circumstances and logical thought organization. She had crying spells, angry outbursts several times per month, and difficulty getting to and staying asleep. She denied change in appetite. She demonstrated poor insight into her behavior but fair social judgment. When asked what she would do if she found an envelope in the street that had been sealed, addressed and with a new

stamp on it, she stated, "Pick it up." When asked what her actions would be upon seeing smoke and fire in a theatre, she stated, "Leave." Dr. Tocci stated that she could make informed personal and financial decisions. The psychologist estimated her functioning to be within the impaired range of intellectual ability.

Dr. Tocci diagnosed: Axis I - Intermittent Explosive Disorder. She assessed a Current Year GAF of 60 and Past Year GAF of 60. These scores, according to the *Diagnostic and Statistical Manual of Mental Disorders,* represent moderate symptoms or moderate impairment in social and occupational functioning. Dr. Tocci noted that the claimant reported that she graduated high school and passed the exit examination. However, her performance during the mental status exam suggested that she had some cognitive impairment. Dr. Tocci stated that the claimant did not evince malingering but it was a possibility. In her opinion: The claimant appeared to have significant issues that would impede her ability to engage in employment activities but further information was required to identify her issues.

Linda Duke, Ph.D., completed a form entitled, "Mental Residual Functional Capacity Assessment," dated February 15, 2012 (Exhibit C15F). Therein, she indicated that the claimant has no more than moderate limitations in her ability to perform the mental demands of basic work activities. She wrote: The claimant has the ability to understand, recall and carry out short, simple instructions and to attend to such tasks for two-hour intervals. Her contact with the general public should be minimal. Supervision should be provided in a supportive manner. Changes in the work routine should be infrequent.

Donald E. Hinton, Ph.D., completed a form entitled, "Mental Residual Functional Capacity Assessment," dated April 30, 2012 (Exhibit C21F). Therein, he indicated that the claimant has no more than moderate limitations in her ability to perform the mental demands of basic work activities. He wrote: The claimant is capable of understanding and remembering short, simple instructions. She is capable of performing simple tasks over an 8-hour workday. She can concentrate for 2-hour periods. Her contact with coworkers, supervisors and the general public should be casual and non-confrontational. Supervision should be provided in a supportive manner. Changes in the work place should be introduced slowly.

Richard Reynolds, Ph.D., completed medical source opinion form, dated September 13, 2013 (Exhibit C28F). Therein, he indicated that the claimant has mild limitations in her ability to understand and remember simple instructions. She has moderate limitations in her

ability to understand detailed or complex instructions; to carry out simple instructions; and to use judgment in simple one or two-step work-related decisions. She has "marked" limitations in her ability to remember and carry [out] detailed or complex instructions; to respond appropriately to supervision, co-workers, and the general public; to deal with changes in a routine work setting; to use judgment in detailed or complex work-related decisions; and to maintain attention, concentration or pace for periods of at least two hours. She has marked to extreme limitation in her ability to respond to customary work pressures. The undersigned notes that, at the time Dr. Reynolds completed this form, claimant and her family had suddenly begun to report significant symptoms.

Richard Reynolds, Ph.D., completed a medical source statement, dated June 18, 2014 (Exhibit C36F). In his opinion, the claimant cannot perform sustained work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week or an equivalent work schedule. As noted previously, the undersigned gave this opinion little weight. It is not consistent with the treatment notes, the claimant's academic successes and the other medical opinions discussed in this decision, including one opinion suggesting that the claimant is malingering.

The undersigned Administrative Law Judge finds that claimant is able to perform the mental demands of basic work activities. She suggests in her testimony that, even with medication, she has homicidal thoughts, tries to injure hurt [sic] herself, and hears voices every day. Her testimony is unpersuasive. First, the claimant has not taken her psychotropic medications as prescribed. Her doctor -- based upon Dr. Reynolds' recommendations -- has prescribed Lexapro (Escitalopram) and Zyprexa (Olanzapine) in *monthly supplies* since at least 2012. Pharmacy records indicate that the claimant has not refilled her psychotropic medications timely (Exhibits C30E, C43E)….

Second, reports by the claimant and family members of increased symptoms, in September 2013, occurred after she filed her request for hearing. As such, their reports are suspect. Prior to September 2013, Dr. Reynolds noted that the claimant was stable with medications (Exhibit C29F, page 12). In August 2013, he assessed a GAF of 55, indicative of moderate symptoms or moderate impairment in social and occupational functioning. Despite said reports, Dr. Reynolds continued with very conservative treatment during the adjudicative period. He has not recommended psychiatric hospitalization. He has not recommended an increase in frequency of family counseling. He has not recommended additional psychotropic medications.

Third, school records, clinical observations, and activities of daily living indicate that the claimant is capable of performing simple work tasks with limited interaction with people. In high school, the claimant was in a regular education classroom. In 12th grade, she received remediation in reading and math to help prepare her for taking the Alabama High School Graduation Exam (AHSGE). In May 2011, she graduated high school with a standard diploma. School officials note that she was able stay on task and complete all of her assignments and that, while she kept to herself most of the time, she got along with her peers very well (Exhibit C29E, page 6). Health professionals have generally observed her to be alert and fully oriented and to have adequate speech, logical thought content, concrete reasoning, normal affect and mood, and intact memory. From a mental standpoint, she can take [care] of her personal needs; prepare simple meals; use the microwave; do household chores, such as cleaning her room, washing dishes and laundry, and sweeping the floors; shop in stores; play cards or checkers; and use a computer to play video games. She attends church and has friends. She does not drive because of seizures (Exhibits C9E, C13E, C12F, Testimony).

The undersigned Administrative Law Judge notes that the claimant testified to having drowsiness from medication and having to lie down "all day." She did not state which medications caused side effects. However, in a disability report, she wrote that Phenytoin (Dilantin), Topiramate, Vimpat, Zyprexa (Olanzapine), and Loratadine cause drowsiness, sleepiness and/or dizziness (Exhibit C27E). The undersigned does not accept her testimony or report. Walid Freij, M.D., claimant's neurologist, repeatedly states in his records that claimant has no side effects from medications (Exhibits C19F, C26F, C35F). The records of PineApple Health Center are absent any complaints of side effects from medication or allergies (Exhibits C32F, C39F). Nonetheless, the undersigned has considered the possibility of side effects in forming the residual functional capacity by restricting the claimant against working in hazardous environments or at unprotected heights and operating hazardous machinery or motorized vehicles.

As for the opinion evidence, the undersigned Administrative Law Judge gives significant weight to the opinions of Kathy Welch and Rebecca Root. They generally agree that claimant has age appropriate articulation skills and that her language skills do not significantly interfere with her ability to communicate with others (Exhibits C22F, C23F). Misses Welch and Root are speech and language pathologists. Ms. Welch examined the claimant and performed testing. Ms. Root reviewed Ms. Welch's evaluation. Their opinions are supported by the consultative examination and testing and are generally consistent with

Dr. Tocci's evaluation (Exhibit C12F), Dr. Reynolds' treatment records (Exhibit C31F, page 6), and the absence of speech therapy.

The undersigned gives significant weight to the opinions of Linda Duke, Ph.D., and Donald Hinton, Ph.D., regarding claimant's mental functional abilities (Exhibits C15F, C21F). Drs. Duke and Hinton generally agree that the claimant has no more than moderate limitations in her ability to perform the mental demands of basic work activities and that she can perform simple tasks in the workplace with some restriction in social interaction. These psychologists reviewed part of [the] record, including Dr. Tocci's report. Their opinions are generally consistent with school records (Exhibit C29E), intelligence testing in 2011 (Exhibit C6F), and Dr. Reynolds' GAF assessments of 55.

The undersigned gives some, but not great weight to Nina Tocci's opinions regarding claimant's mental functional abilities (Exhibit C12F). Dr. Tocci noted that claimant's performance during the mental status exam suggested a cognitive impairment but this was not consistent with a high school graduate who had passed the exit exam. The undersigned agrees with this opinion. During Dr. Tocci's evaluation, the claimant could not correctly state, among other things, the number of months ("7") in a year. This strongly suggests blatant malingering by the claimant when considering her placement in the general education classroom and her receipt of a standard high school diploma. Dr. Tocci also provided a Current GAF and Past Year GAF of 60. This is consistent with Dr. Reynolds' GAF score of 55. However, Dr. Tocci also concluded that the claimant appeared to have significant issues that would impede her ability to engage in employment activities. This statement is vague and has less probative value here. Dr. Tocci went on to state that *further information was required to identify her issues.* It appears that Dr. Tocci did not have in her possession claimant's case file, in particular school records, for her review to make [a] definite judgment call with regard to claimant's ability to work.

The undersigned gives little weight to the opinions of Richard Reynolds, Ph.D., regarding claimant's mental functional abilities (Exhibits C28F and C36F). Dr. Reynolds is claimant's treating psychologist. Among other things, he indicated that the claimant has marked limitations in her ability to respond appropriately to supervision, co-workers, and the general public; to deal with changes in a routine work setting; and to maintain attention, concentration or pace for periods of at least two hours. She has marked to extreme limitation in her ability to respond to customary work pressures. The undersigned generally disagrees. The undersigned notes, with particularity, that the date of Dr. Reynolds' medical source statement -- September 13, 2013 -- closely coincides

with claimant's and her family's sudden reports of increased symptoms on September 9, 2013 (Exhibit C29F, page 12). That day he noted that the claimant was "off meds" but was "stable when on meds." These reports occurred after she filed her request for hearing by an administrative law judge (Exhibit C13B). Prior to September 2013, Dr. Reynolds had noted improvement in claimant's emotional and mental state with treatment (Exhibit C29F). On August 7, 2013, he provided a GAF assessment of 55, which indicated only moderate limitations in claimant's overall functioning. The timing of these events puts into question Dr. Reynolds' degrees of limitation, as they appear to have been based primarily upon claimant's and her family's reports and when the claimant was not taking medications as prescribed. Dr. Reynolds' opinions are also inconsistent with his treatment plan, which has consisted of monthly outpatient family counseling and low doses of psychotropic medications.

The undersigned gives only some weight to the opinions of Elizabeth Minto, M.D., and Gregory Parker, M.D., regarding claimant's physical functional abilities (Exhibits C16F, C24F). Drs. Minto and Parker generally agree that the claimant can perform a range of heavy exertional work with postural and environmental restrictions. They are nonexamining, nontreating doctors who reviewed only part of the record. They did not consider the combined effects of claimant's allergic rhinitis, anemia and particularly her obesity upon her exertional abilities. However, they did consider her eye problems, obesity and/or seizure disorder by providing postural and environmental restrictions.

The undersigned has considered the function reports completed by claimant's uncle Carl Fairley, her mother Mary Jones, and her grandmother Sylvia Jones and gives them little weight (Exhibits C5E, C9E, C10E, C13E). All these family members note serious problems with claimant's ability to complete tasks, concentrate, understand, follow directions and/or get along with others. Their reports are exaggerated. They are inconsistent with the evidence of record. For example, Mr. Fairly states that the claimant did not obtain a school diploma (Exhibit C10E, page 10).

School records, on the other hand, show that the claimant graduated high school in May 2011 with a standard diploma (Exhibit C29E, page 1). Sylvia Jones writes that the claimant stutters when she talks and cannot be understood (Exhibit C21E, page 6). However, during a consultative speech and language evaluation, the speech pathologist observed the claimant to have no dysfluency in articulation (Exhibit C22F). On June 29, 2011-- one month after claimant's high school graduation-- Mary Jones wrote that the claimant could not pay attention

long or complete tasks. Yet, school officials noted that the claimant could stay on task and complete her assignments (Exhibit C29E, page 6). The undersigned notes that the claimant has lived with her mother and grandmother during the adjudicative period and that her grandmother handles her SSI payments. They have a financial interest in seeing that the claimant is found disabled.

6.    **The claimant has no past relevant work (20 CFR 416.965).**

7.    **The claimant was born on August 25, 1993 and is a younger individual age 18-49 (20 CFR 416.963).**

8.    **The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).**

The claimant completed 12th grade in school, passed the Alabama High School Graduation Exam (AHSGE) and graduated on May 23, 2011 with a standard diploma (Exhibit C29E, pages 1-2).

(Tr. 23-47 (internal footnotes omitted) (emphasis in original)).

## V.  DISCUSSION

A claimant is entitled to an award of SSI benefits if the claimant is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of not less than 12 months. *See* 20 C.F.R. § 416.905(a). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation in determining whether the claimant is disabled:

> (1) whether the claimant is engaged in substantial gainful activity;
> (2) if not, whether the claimant has a severe impairment; (3) if so,
> whether the severe impairment meets or equals an impairment in
> the Listing of Impairment in the regulations; (4) if not, whether the
> claimant has the RFC to perform her past relevant work; and (5) if
> not, whether, in light of the claimant's RFC, age, education and
> work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999

If the claimant appeals an unfavorable ALJ decision, the reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id.* When a decision is supported by substantial evidence, the reviewing court must affirm

"[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

Jones has asserted three reasons the Commissioner's decision to deny her benefits is in error. After reviewing the evidence and considering the relevant legal standards, the Court has determined, as set forth below, that the Commissioner's decision was not in error.

**A. ALJ Erred by Finding No Severe Impairment**

Jones contends that the ALJ erred "in finding Miss Jones did not have any severe impairments." (Doc. 22 at p. 12). This argument, however, is not supported by the facts. Although the ALJ "found that, individually, none of the claimant's impairments cause greater than slight limitation in her capacity for work activity," and "[t]herefore, individually, they are nonsevere," he did find "that they may be severe in combination." He then analyzed the extent of Jones's limitations based on the impairments in combination in formulating her RFC. (Tr. 23-27).

As noted above, step two of the sequential analysis requires the ALJ to determine whether the claimant has a severe impairment or combination of impairments. *See Hearn v. Comm'r, Soc. Sec. Admin.*, 619 F. App'x 892, 895 (11th Cir. 2015); *Watkins,* 457 F. App'x at 870 (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips,* 357 F.3d at 1237). "If the ALJ determines at step two that there is no severe impairment, then the claimant is not disabled." *Hearn,* 619 F. App'x at 895 (citing 20 C.F.R. § 416.920(c)). A

"finding of any severe impairment, whether or not it results from a single severe impairment *or a combination of impairments* that together qualify as 'severe,' is enough to satisfy step two." *Id*. (citing *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)) (emphasis added). Because the ALJ found that Jones did have a combination of impairments that qualified as severe and continued on to step three of the analysis, the Court finds that the ALJ did not err at step two.

## B. <u>ALJ Erred in Assessing the Weight Given to Medical Opinions</u>

Jones contends that the ALJ erred when he rejected the opinion of her treating neurologist, the opinion of her treating psychologist, and the opinion of the psychological consultative examiner. (Doc. 22 at pp. 6-12). The Commissioner asserts that the ALJ properly weighed the opinions of these three physicians.

The relevant social security regulations provide that medical opinions are weighed under the following factors: 1) whether the source of the opinion examined the claimant; 2) whether the source treated the claimant and, if so, a) the length of the treatment relationship and the frequency of examination and b) the nature and extent of the treatment relationship; 3) the supportability of the opinion with relevant evidence and by explanations from the source; 4) the consistency of the opinion with the record as a whole; 5) whether the opinion was offered by a specialist about a medical issue related to his or her area of specialty; and 6) any other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6); *see also Nichols v. Comm'r, Soc. Sec. Admin.*, 679 F. App'x 792, 797 (11th Cir. 2017) (citing 20 C.F.R. §§ 404.1527(c),

416.927(c)) (stating that "[i]n determining how much weight to give a medical opinion, the ALJ considers such factors as the examining or treating relationship, whether the opinion is well-supported, whether the opinion is consistent with the record, and the doctor's specialization.").

In the instant case, the ALJ provided an extensive review of the medical evidence in his Decision. He also provided an extensive explanation of his reasoning for not finding Jones, her mother, and her grandmother to be credible reporters. Based on this extensive review of the records and testimony, the ALJ accorded little weight to the opinion of Jones's treating neurologist, Dr. Freij, wherein he indicated that Jones had convulsive seizures more than once a month and nonconvulsive seizures about once a week and that she had good compliance with treatment. Specifically, the ALJ stated:

> Description of seizures indicates they are both convulsive and nonconvulsive. Emergency room records seem to show they are mostly nonconvulsive with no shaking, jerking or loss of bowel or urine (Exhibit C17F). Whether convulsive or nonconvulsive, it is unclear from the treatment record her seizures' frequency. However, the undersigned notes that a treating neurologist Walid W. Freij, M.D., has completed a medical source statement, dated June 24, 2014 (Exhibit C37F). Therein, he indicated that the claimant has convulsive seizures more than once a month and nonconvulsive seizures about once a week and that she had good compliance with treatment. The undersigned gives little weight to this opinion. First, there is no evidence that Dr. Freij has witnessed seizure activity in his office. He has only seen the claimant for routine visits every six months. His opinion is based solely upon the reports of the claimant and her family members. Second, the doctor's progress notes do not contain specific information regarding the number of convulsive seizures and the number of nonconvulsive seizures during the six-month periods between doctor visits. In fact, in progress notes dated May 12, 2013 --the month prior to completing his medical source statement-- Dr. Freij noted that, **based upon the responses of the claimant and her grandmother, he could not tell how many seizures she was experiencing** (Exhibit C38F) (emphasis added). Moreover, while the doctor reports compliance with treatment, the

medical record shows the claimant to have a significant history of medication noncompliance; low levels of Dilantin (Phenytoin) in her system during the adjudicative period; and untimely refills of anti-seizure medications, as shown in pharmacy records, which suggest missed doses (Exhibits C30E, C43E, C3F, C17F, C18F, C25F).

(Tr. 28).

Jones argues that the ALJ erred in according little weight to Dr. Freij's opinions because he failed to develop the record with regard to the reason Jones was not following the prescribed treatment. For several reasons, this argument is not persuasive. First, the ALJ did develop a record regarding the reasons she failed to follow the prescribed treatment. He documented how the rise and fall in seizure activity through the years waxed and waned depending on whether Jones had a disability application pending, and he also cited medical records in which Jones had reported to doctors that she "sometimes took three [Dilantin], sometimes four, or just whatever she decided to take." (Tr. 36). There is no evidence that the failure to take her medication was related to its unavailability. Her argument also fails because the ALJ also discounted Dr. Freij's opinions because they were inconsistent with his own records and with the record as a whole. Accordingly, the Court finds that the ALJ did not err in according little weight to Dr. Freij's opinions.

The ALJ gave some, but not great weight, to the opinions of the psychological consultative examiner, Nina Tocci, Ph. D., regarding Jones's mental functional abilities. Specifically, the ALJ stated:

The undersigned gives some, but not great weight to Nina Tocci's opinions regarding claimant's mental functional abilities (Exhibit C12F).

40

Dr. Tocci noted that claimant's performance during the mental status exam suggested a cognitive impairment but this was not consistent with a high school graduate who had passed the exit exam. The undersigned agrees with this opinion. During Dr. Tocci's evaluation, the claimant could not correctly state, among other things, the number of months ("7") in a year. This strongly suggests blatant malingering by the claimant when considering her placement in the general education classroom and her receipt of a standard high school diploma. Dr. Tocci also provided a Current GAF and Past Year GAF of 60. This is consistent with Dr. Reynolds' GAF score of 55. However, Dr. Tocci also concluded that the claimant appeared to have significant issues that would impede her ability to engage in employment activities. This statement is vague and has less probative value here. Dr. Tocci went on to state that *further information was required to identify her issues.* It appears that Dr. Tocci did not have in her possession claimant's case file, in particular school records, for her review to make [a] definite judgment call with regard to claimant's ability to work.

(Tr. 46).

Jones argues that the ALJ's assessment of Dr. Tocci's opinion is in error because his assessment was based on his inability to determine whether she had reviewed Jones's school records. (Doc. 22 at p. 7). While he made this statement, he also discredited Dr. Tocci's conclusion that Jones appeared to have significant issues that would impede her ability to engage in employment activities because the statement was vague and lacked probative value because it was contrary to other evidence. It is well-settled that determination of whether a claimant is disabled from doing gainful work is an issue reserved to the Commissioner, and a doctor's opinion on that issue can be disregarded. *See Lowery v. Berryhill*, Civ. A. No. 4:16-cv-00913-AKK, 2017 WL 1491274, at *3 (N.D. Ala. Apr. 26, 2017) (citing *Pate v. Comm'r, Soc. Sec. Admin.*, 678 F. App'x 833, 834 (11th Cir. 2017) ("the determination of whether an individual is disabled is reserved to the Commissioner, and no special significance will be given to an

opinion on issues reserved to the Commissioner."")); *see also Green v. Soc. Sec. Admin.,* 223 F. App'x 915, 923 (11th Cir. 2007) (holding that "the ALJ will evaluate a [physician's] statement [concerning a claimant's capabilities] in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ). In addition, a physician's opinion as to a claimant's ability to work is not entitled to recognition from an ALJ if the opinion is not supported by or consistent with the totality of the evidence. *Id*. "In assessing whether a claimant is disabled, an ALJ must consider the medical opinions in a case record *together with the rest of the relevant evidence received*." *Chambers v. Comm'r of Soc. Sec.*, 662 F. App'x 869, 870 (11th Cir. 2016) (citing 20 C.F.R. § 404.1527(b)) (emphasis added). "[T]he more consistent an opinion is with the record as a whole, the more weight the ALJ will give to that opinion." *Id.* (citing 20 C.F.R. 404.1527(c)(4)). In light of the foregoing, the Court finds that, considering the record as a whole, the ALJ did not err by according some, but not great weight, to Dr. Tocci's opinion concerning the ultimate issue of whether Jones had the ability to engage in employment activities.

The ALJ also accorded little weight to the opinions of Jones's treating psychologist, Richard Reynolds, Ph. D., who indicated in a medical source statement that he completed on June 18, 2014 that Jones met the qualifications for listings 12.03 and 12.04. Specifically, he explained as follows:

> As noted, Richard Reynolds, Ph.D., completed a medical source statement, dated June 18, 2014 (Exhibit C36F). Therein, he indicated that the claimant meets the qualifications for listings 12.03 and 12.04. Dr. Reynolds is a treating psychologist. However, the undersigned gives little weight to his opinion. First, Dr. Reynolds does not state with specificity how these listings are met under paragraphs A, B or C.

Second, from review of his progress notes, Dr. Reynolds appears to have based his opinion primarily upon the subjective reports of the claimant and her family members on June 17, 2014 (Exhibit C40F, page 10). Third, Dr. Reynolds' opinion is inconsistent with mental health treatment during the adjudicative period. The claimant has required no psychiatric hospitalizations. She has attended outpatient family counseling on a monthly basis and taken low doses of psychotropic medications. Fourth, on October 7, 2014, Dr. Reynolds noted that the claimant was generally stable on medication with two or three "bad days" per week with anger outbursts and paranoid ideation and that the claimant has been compliant with medication (Exhibit C40F, page 2). Yet, other evidence shows noncompliance. According to Dr. Reynolds' records, the claimant should have been taking Lexapro (Escitalopram) and Zyprexa (Olanzapine) during the adjudicative period. Pharmacy records show untimely refills of these medications (Exhibits C30F, C43F). The undersigned notes that, while claimant's grandmother controls her SSI payments (See Testimony), it does not appear that she made sure that claimant gets her medication regularly. This puts into question whether claimant's family members truly see her as mentally disabled. Fifth, Dr. Reynolds' opinion is inconsistent with those of Drs. Duke and Hinton.

* * *

Richard Reynolds, Ph.D., completed a medical source statement, dated June 18, 2014 (Exhibit C36F). In his opinion, the claimant cannot perform sustained work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week or an equivalent work schedule. As noted previously, the undersigned gave this opinion little weight. It is not consistent with the treatment notes, the claimant's academic successes and the other medical opinions discussed in this decision, including one opinion suggesting that the claimant is malingering.

* * *

The undersigned gives little weight to the opinions of Richard Reynolds, Ph.D., regarding claimant's mental functional abilities (Exhibits C28F and C36F). Dr. Reynolds is claimant's treating psychologist. Among other things, he indicated that the claimant has marked limitations in her ability to respond appropriately to supervision, co-workers, and the general public; to deal with changes in a routine work setting; and to maintain attention, concentration or pace for periods of at least two hours. She has marked to extreme limitation in her ability to respond to customary work pressures. The undersigned generally disagrees. The undersigned notes, with particularity, that the date of Dr. Reynolds' medical source statement -- September 13, 2013 -- closely coincides

with claimant's and her family's sudden reports of increased symptoms on September 9, 2013 (Exhibit C29F, page 12). That day he noted that the claimant was "off meds" but was "stable when on meds." These reports occurred after she filed her request for hearing by an administrative law judge (Exhibit C13B). Prior to September 2013, Dr. Reynolds had noted improvement in claimant's emotional and mental state with treatment (Exhibit C29F). On August 7, 2013, he provided a GAF assessment of 55, which indicated only moderate limitations in claimant's overall functioning. The timing of these events puts into question Dr. Reynolds' degrees of limitation, as they appear to have been based primarily upon claimant's and her family's reports and when the claimant was not taking medications as prescribed. Dr. Reynolds' opinions are also inconsistent with his treatment plan, which has consisted of monthly outpatient family counseling and low doses of psychotropic medications.

(Tr. 30, 44, 46).

As noted above, the ALJ accorded little weight to the opinions of Dr. Reynolds regarding Jones's mental functioning abilities. Jones argues that the reasons the ALJ provided in support of this conclusion are not sufficient and not supported by the record. (Doc. 22 at pp. 8-12). Although the opinion of a treating physician, like Dr. Reynolds, is generally entitled to substantial or considerable weight, the ALJ does not have to give a treating physician's opinion considerable weight if good cause is shown to the contrary. *See Phillips v. Barnhart,* 357 F.3d 1232, 1240 (11th Cir. 2004). The Eleventh Circuit "has concluded 'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* at 1240-41. Indeed, "an ALJ may reject any medical opinion if the evidence supports a contrary finding." *Nichols,* 2017 WL 526038, at *5 (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)).

In this case, the ALJ determined and discussed in great detail how Dr.

Reynolds's opinions that Jones cannot perform sustained work on a regular and

continuing basis, that she has marked limitations in her ability to respond

appropriately to supervision, co-workers, and the general public, to deal with

changes in a routine work setting, and to maintain attention, concentration or

pace for periods of at least two hours, and that she has marked to extreme

limitations in her ability to respond to customary work pressures were flawed.

The ALJ described how these opinions were conclusory and inconsistent with Dr.

Reynolds's own medical records and how they were contrary to other evidence in

the record, including other medical records and her academic record. The Court

finds that substantial evidence supported the ALJ's finding that Dr. Reynolds's

opinions that were expressed in the medical source statement were not in line

with his own records or the record as a whole.

## C. **ALJ Erred by Requiring Jones to Have Worked/Attempted to Find Work**

At the conclusion of the first hearing, the ALJ made the following

statement to Jones:

> ALJ: All right. Ms. Jones, I'm not going to make a decision today.
> I'm going to look at other factors, I'm going to read the entire record
> then I'm going to make a decision. However, I will let you know that
> per my initial review of the evidence, I have a very, very, very hard
> time finding that someone is unable to work when they've completed
> high school but have never attempted to work, have never looked for
> a job. For me, those factors are as significant in their absence as
> what is available inside the record. Now I do not know which county
> you live in, but I'm pretty sure you have access to some vocational
> rehab facility.
>
> * * *
>
> ALJ: … and it would behoove you to contact them and see whether

or not you're unable to work before I, as a judge, I can only speak for myself, that I as a judge, will say this individual is unable to work.

(Tr. 105).

At the second hearing, which was held to obtain vocational expert testimony, the ALJ began by asking Jones several questions about her vocational status:

> Q  Ms. Jones, have you engaged in any work activity since our last meeting?
>
> A  No, sir.
>
> Q  All right. Have you attempted to engage in any work activity since our last meeting?
>
> A  No, sir.
>
> Q  All right. Give me one moment here. I can't remember from our last talk but you can refresh my memory if necessary, have you availed yourself or attempted to undergo any vocational training since our last meeting?
>
> A  No, sir.
>
> Q  Okay, all right.
>
> ALJ:  Counsel, anything new that you wish to present via testimony or in addition to the documents that I already have?
>
> ATTY: No.
>
> * * *
>
> ALJ: So, we have a younger individual, high-school education and no past relevant work. Counsel, any objections to the vocational profile?
>
> ATTY: No.

(Tr. 64-65).

Although her attorney did not object to the above statements at the hearing, Tr. 64, 105-06, Jones argued before the Appeals Council and argues here that the ALJ's statements at the first hearing, which she contends imposed an additional obstacle on her attempt to obtain benefits that is not

required or allowed by the applicable regulations, indicated that the ALJ had an impermissible bias against her. (Doc. 22 at p. 6). The regulations provide that "[a]n administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." 20 C.F.R. § 404.940. Courts presume that ALJs are unbiased, and the "presumption is overcome only if it is shown that the ALJ displayed 'deep-seated and unequivocal antagonism' that is 'so extreme' that fair judgment is impossible." *Jamar v. Colvin*, Civil Action No. 15-212-E, 2016 WL 4875292, at *1 n.1 (W.D. Pa. Sept. 14, 2016) (quoting *Liteky v. United States*, 510 U.S. 540, 551, 556 (1994)). Having carefully reviewed both hearing transcripts and the ALJ's written decision, the Court finds that Jones has not overcome the presumption that the ALJ's decision was based on the evidence within the record, which was substantial, and the applicable law, not any preexisting bias toward Jones. "[J]udicial remarks during the course of a trial that are critical or disapproving, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555; *Caffey v. Berryhill,* Civil Action No. 16-0391-N, 2017 WL 3184182, at *8 (S.D. Ala. July 26, 2107). While the ALJ did make those remarks at the hearing, his written decision does not indicate that he relied upon the fact that Jones had not worked, looked for work, or enrolled in vocational training in assessing her RFC or in his hypothetical to the vocational expert. *See Tanner v. Apfel*, No. Civ. A. 99-0957-AH-S, 2000 WL 726891, at *4 n.3 (S.D. Ala. May 18, 2000) (noting that "the Commissioner's

final decision is the written decision of the ALJ and is the decision reviewed by [the] Court," not comments made by the ALJ during the administrative hearing). Accordingly, the Court finds that Jones has not shown that the ALJ was impermissibly biased or placed any additional burden on her.

## CONCLUSION

It is well-established that it is not this Court's place to reweigh the evidence or substitute its judgment for that of the Commissioner. This Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence and based on proper legal standards. The Court finds that the ALJ's Decision that Jones is not entitled to benefits is supported by substantial evidence and based on proper legal standards. Accordingly, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **24th** day of **January, 2018**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**